FILED _____ ENTERED
_____ LODGED _____ RECEIVED

## IN THE UNITED STATES DISTRICT COURT APR 2 5 2017
## FOR THE DISTRICT OF MARYLAND

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| SEARCH OF: | ) | |
| | ) | **17-0687 TJS** |
| **[1] 16460 OVERHILL WAY** | ) | CASE NO. _____ |
| **HUGHESVILLE, MARYLAND,** | ) | |
| **and surrounding WOODED AREA,** | ) | |
| **[TARGET LOCATION 1];** | ) | |
| | ) | **17-0688 TJS** |
| | ) | |
| **[2] 4829 FLOSSMOOR PL. APT #304** | ) | CASE NO. _____ |
| **WALDORF, MARYLAND** | ) | |
| **[TARGET LOCATION 2];** | ) | |
| | ) | **17-0689 TJS** |
| **[3] 931 BARRINGTON DR.** | ) | CASE NO. _____ |
| **WALDORF, MARYLAND** | ) | |
| **[TARGET LOCATION 3]** | ) **FILED UNDER SEAL** | |

### AFFIDAVIT IN SUPPORT OF
### APPLICATIONS FOR SEARCH WARRANTS

I, Greg B. O'Haver, being first duly sworn, depose and state as follows:

#### Purpose of the Affidavit

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, this is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. This Affidavit is made in support of search warrants for the following target locations:

  a)  16460 Overhill Way, Hughesville, Maryland, and the surrounding wooded area, regardless of ownership, as described in attachment A-1

  ("**Target Location 1**");

  b)  4829 Flossmoor Place, Apt. 304, Waldorf, Maryland, as described in

attachment A-2 ("**Target Location 2**"); and

c) 931 Barrington Drive, Waldorf, Maryland, as described in Attachment B-3 ("**Target Location 3**") (collectively, the **Target Locations**").

### Introduction

2.      I am currently a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"), assigned to the Hyattsville I Field Office. I have been employed by the ATF since in or about January 2015. I have successfully completed the Federal Law Enforcement Training Center Criminal Investigator Training Program and the ATF Special Agent Basic Training program for a combined period of 26 weeks.

3.      Prior to my tenure with the ATF I was a sworn police officer with the Metropolitan Police Department in Washington, D.C. and, prior to that, a sworn probation/parole officer with the Tennessee Department of Correction.

4.      During my tenure as a law enforcement officer, I have participated in investigations that have led to the arrest of various narcotics dealers, including those involved in distributing substances such as cocaine, cocaine base (a/k/a "crack"), heroin, methamphetamine, and marijuana, among others.  I have also received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of other investigative tools available to law enforcement officers.

5.      In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.

6.      In the course of conducting my investigations, including narcotics investigations, I

have been involved in the use of the following investigative techniques, among others: interviewing informants and cooperating sources; conducting physical surveillance; analyzing telephone pen register and caller identification data; conducting court-authorized intercepts of wire and electronic communications; and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

7.      Based on my training, experience, knowledge and participation in narcotics and firearms investigations and the training and experience of other agents and detectives with whom we are working closely in this investigation, I know that:

> a. Individuals who deal in illegal controlled substances often maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as in secure locations within their residences and their curtilage, the residences of family members, friends and associates, the places of operation of their drug distribution activities, such as stash houses or safe houses, in business locations with which the trafficker is associated, or in storage areas.
>
> b. Individuals who deal in illegal controlled substances routinely conceal in their residences and/or curtilage, the residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses

–3–

or safe houses, large quantities of currency, financial instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions.

c.  It is common for individuals who deal in the sale of illegal controlled substances, particularly cocaine, to secrete contraband related to the activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, hair dryers, blenders, pots, dishes and other containers for preparing cocaine base, cocaine and other controlled substances for distribution, at their residences, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses or storage areas.

d.  Individuals who deal in the sale and distribution of illegal controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organization. These individuals often utilize cellular telephones, computers and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, computers, bills and telephone numbers are often found in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses or storage areas.

e.  Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband.  These

4

photos are usually maintained in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses or storage areas.

f.  Individuals who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses or safe houses, or in storage areas. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, amounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions, and records indicating the existence of storage facilities used in narcotics trafficking.

g.  Individuals involved in narcotics trafficking often own, possess and/or use weapons as a means of facilitating their illegal drug activities. Such weapons are most often secreted in their residences (including the surrounding curtilage), or the residences and curtilage of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses or storage areas.

h.  Individuals who are members of ongoing drug organizations stay in regular

5

contact with one another.   This contact does not terminate once an individual is incarcerated.   Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination.   In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

8.     This affidavit contains only such information as is necessary to establish probable cause for the issuance of search warrants for the **TARGET LOCATIONS** and, therefore, does not include each and every fact and matter observed by me, other investigators, or known to the government relating to the subject matter of this investigation.

### OVERVIEW OF INVESTIGATION AND
### STATEMENT OF PROBABLE CAUSE

9.     Based on the facts set forth in this affidavit, derived through an investigation in which I have participated for a period of months, I submit that there is probable cause to believe that John Luis THOMAS JR., Jaquil Cavan GRAY-THOMAS, and others have committed, are committing, and will commit federal offenses including: (1) conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; and (2) possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1).   Furthermore, I submit that there is probable cause that in the above-named **TARGET LOCATIONS** will be found fruits, evidence, and instrumentalities of these crimes.

**A.  Search Warrants at TARGET LOCATION 1**

10.     On or about December 2, 2015, members of the Charles County Sheriff's Office (the "CCSO") Criminal Investigations Division, Narcotics Enforcement Section, and Agents of the ATF assisted the Lynchburg (Virginia) Police Department in the execution of a Maryland search and seizure warrant at **TARGET LOCATION 1**.  That warrant was based on a then-ongoing homicide investigation involving Dajuan Quantez GRAY ("Dajuan Gray"), one of THOMAS JR.'s sons, who is GRAY-THOMAS's older half-brother.

11.     During the execution of that warrant, members of the CCSO Emergency Services Team detected the strong odor of raw marijuana as they approached **TARGET LOCATION 1**. Based on these observations, officers obtained another Maryland search and seizure warrant, which authorized investigators searching that residence related to the homicide investigation to *also* search for and seize evidence related to violations of Maryland's drug laws.

12.     During the search, over $19,000.00 in U.S. Currency and approximately 6 pounds of suspected marijuana were recovered, along with packaging material and two digital scales.

13.     On April 25, 2016, officers obtained Maryland state arrest warrants for THOMAS JR. and Yolanda Lynell GRAY ("MOMMA GRAY"), which were based the evidence recovered during the above-described December 2, 2015, search.

14.     On May 12, 2016, members of the CCSO Narcotics Enforcement Section executed another Maryland search and seizure warrant at **TARGET LOCATION 1**, which authorized investigators to search that location for THOMAS JR. and MOMMA GRAY, based on the above-referenced arrest warrants. When members of the CCSO Emergency Services Team made entry during the search, they again detected the strong odor of raw marijuana.   Officers then obtained another Maryland search and seizure warrant, authorizing investigators to search for and seize evidence related to violations of Maryland's drug laws.

7

15.     During the search, $6,139.00 in U.S. Currency, a quantity of suspected marijuana, and empty, bulk packaging materials were recovered.   THOMAS JR. and MOMMA GRAY were arrested for the open arrest warrants and transported to the Charles County Detention Center. That same day, Detectives spoke to an individual who lived nearby **TARGET LOCATION 1**, and that individual stated that THOMAS JR. kept his drugs in the woods around **TARGET LOCATION 1**.   Detectives then searched the nearby wooded area, with negative results

### B. Controlled Purchases of Cocaine and Crack Cocaine
### from THOMAS JR. at TARGET LOCATION 1 by Confidential Sources

16.     In or about August 2016, CCSO Narcotics Enforcement Section Detectives met with a CCSO confidential source ("CS-1").[1] During this meeting, CS-1 told Detectives that THOMAS JR. was selling a large quantity of cocaine and crack cocaine.   CS-1 stated that he/she had observed THOMAS JR. sell in excess of an ounce at a time on more than one occasion.   CS-1 made these observations at THOMAS JR.'s, residence: **TARGET LOCATION 1**. CS-1 said that THOMAS JR. hid the vast majority of his cocaine in the woods around that residence, along with a digital scale (which I know, from training and experience, is a common tool of the drug trade, utilized by drug dealers to weigh out narcotics and/or cutting agents for said narcotics). CS-1 added that, in his/her experience, THOMAS JR. would not go in the woods to retrieve the

---

[1]   CS-1 is presently facing Maryland state narcotics charges and is cooperating with law enforcement in the hope of receiving a reduced sentence. CS-1 has been cooperating with law enforcement since in or about October 2014 and since that time has consistently provided information that officers have found to be reliable.   Indeed, to my knowledge, CS-1 has never provided information to law enforcement that was subsequently found to be false.   Information provided by CS-1 has resulted in, among other things, search warrants resulting in the seizure of narcotics (including cocaine and crack cocaine), and the arrest and conviction of multiple individuals.

drugs and scale himself, but would instead send his 17-year-old son, GRAY-THOMAS, to get those items whenever a drug customer arrived to make a purchase.

17.      In or about August 2016, CCSO Detectives met with CS-1 for the purpose of conducting a controlled purchase of cocaine from THOMAS JR. at **TARGET LOCATION 1**. This controlled purchase was prearranged by CS-1, in the days leading up to the purchase.   On the day of the purchase, officers met with CS-1 and equipped CS-1 with an audio/video-recording/transmitting device for the purpose of monitoring the controlled purchase, as well as U.S. Currency to be used to purchase cocaine from THOMAS JR.   Prior to the controlled purchase, CS-1 was searched for contraband (including drugs and unauthorized funds), with negative results.   Following this pre-operation meeting, officers followed CS-1 to the area of **TARGET LOCATION 1**.   Once at that residence, CS-1 was allowed inside and met with THOMAS JR.   After a brief conversation, THOMAS JR. provided a quantity of cocaine to CS-1 in exchange for the U.S. Currency that CS-1 had been provided by law enforcement.   CS-1 then departed **TARGET LOCATION 1**, officers picked up surveillance nearby the **TARGET LOCATION 1**, and they followed CS-1 to a predetermined location. Once at that location, officers recovered a quantity of suspected cocaine that CS-1 purchased from THOMAS JR.   CS-1 was also again searched for contraband (including drugs and unauthorized funds), with negative results other than the drugs acquired from THOMAS JR.

18.      In or about September 2016, CCSO Narcotics Enforcement Section Detectives met with another CCSO confidential source ("CS-2").[2]   During this meeting, CS-2 told Detectives

---

[2] CS-2 cooperated with law enforcement, on and off, from the late 1990s until in or about late 2016.   In that time, CS-2 consistently provided information that officers found to be reliable. Information provided by CS-2 has resulted in, among other things, multiple search warrants resulting in the seizure of large quantities of narcotics (including cocaine and crack cocaine) and

that THOMAS JR. was selling a large quantity of cocaine and crack cocaine.   CS-2 stated that it could purchase ounce quantities of narcotics from THOMAS JR.   CS-2 continued, saying that THOMAS JR. sells from **TARGET LOCATION 1**.   CS-2 said THOMAS JR. keeps most of his cocaine in the woods around the residence, along with a digital scale.   CS-2 said that he/she had observed THOMAS JR.'s son, GRAY-THOMAS, retrieve that contraband from the woods.

19.     During the month of September 2016, CCSO Detectives met with CS-2 for the purpose of conducting a controlled purchase of crack cocaine from THOMAS JR. at **TARGET LOCATION 1**.   This controlled purchase was prearranged by CS-2 in the days leading up to the purchase.   Prior to the purchase, officers met with CS-2 and equipped CS-2 with an audio/video-recording/transmitting device for the purpose of monitoring the controlled purchase, as well as U.S. Currency to be used to purchase cocaine from THOMAS JR.   Prior to the controlled purchase, CS-2 was also searched for contraband (including drugs and unauthorized funds), with negative results.   Following this pre-operation meeting, officers drove CS-2 to **TARGET LOCATION 1**.   CS-2 was allowed inside and met with THOMAS JR.   After a brief conversation, THOMAS JR. sent his son, GRAY-THOMAS, outside to retrieve a quantity of

---

firearms, as well the arrests and conviction of multiple individuals.   CS-2's most recent proactive stint with law enforcement began when he/she approached law enforcement in or about August 2016 because CS-2 was in fear for his/her life, based on the fact that CS-2 owed THOMAS JR. a substantial drug debt.   Law enforcement gave CS-2 monies to settle his/her debt to THOMAS JR., and CS-2 worked under law enforcement direction in his subsequent dealings with THOMAS JR.   To my knowledge, CS-2 has never provided information to law enforcement that was subsequently found to be false, with one possible exception – that is, CS-2's failure to be honest about his own criminal activity in late 2016.   More specifically, in or about December 2016, CS-2 was arrested, having been found in possession of a distributable quantity of crack cocaine.   CS-2 was deactivated as a source at that time.   Despite this, law enforcement believes the information provided by CS-2 regarding THOMAS JR. is credible based on, among other things, corroboration by controlled calls and purchases in which CS-2 participated, and information and controlled purchases involving CS-1.

crack cocaine from a location in the surrounding woods. Upon GRAY-THOMAS's return, THOMAS JR. exchanged a quantity of cocaine with CS-2 for the U.S. Currency that he/she had been provided by law enforcement.   CS-2 then departed the area, met with law enforcement, and was then driven to a predetermined location.   Once at this location, officers recovered a quantity of suspected crack cocaine from CS-2, which CS-2 purchased from THOMAS JR.   CS-2 was also again searched for contraband (including drugs and unauthorized funds), with negative results other than the drugs acquired from THOMAS JR.

20.     Between the months of October 2016 through December 2016, law enforcement— including the CCSO, ATF, and Drug Enforcement Administration ("DEA")—conducted six additional controlled purchases of crack cocaine from THOMAS JR., all of which occurred at **TARGET LOCATION 1** and involved CS-1 and/or CS-2.   In each instance, CS-1 and/or CS-2, as applicable, met with officers before and after the deal, were searched for unauthorized contraband/monies with negative results, were equipped with audio- and/or video-recording/transmitting equipment, were provided with U.S. Currency to purchase the drugs, and were monitored by law enforcement.   The quantities of purchased crack cocaine varied between one-quarter of an ounce and one ounce.   GRAY-THOMAS was present during at least half of these controlled purchases and, on several occasions, GRAY-THOMAS retrieved the product and/or scale from the nearby woods in order to assist THOMAS JR.'s drug-dealing.   During at least two of these purchases, an undercover DEA agent drove either CS-1 or CS-2 to **TARGET LOCATION 1**. The undercover DEA agent never entered **TARGET LOCATION 1**, but was on the premises and observed GRAY-THOMAS exit the residence and retrieve product (i.e., crack cocaine) from various locations in the nearby wooded area.

11

**C. Additional Intelligence and Observations of THOMAS JR. and his Associates' Drug-Trafficking Involving the TARGET LOCATIONS**

21.     In or about November 2016, investigators met with CS-2, who told investigators that THOMAS JR. had been staying most nights with his girlfriend in Waldorf, Maryland. At that time, CS-2 did not know that girlfriend's name.   CS-2 directed officers to that residence, an apartment located in an apartment complex at 4829 Flossmoor Place, Waldorf, Maryland (the apartments at Gleneagles North).   **TARGET LOCATION 2** is within this complex, located on the third floor (i.e., Apt. #304).

22.     CS-2 stated that he/she had been with THOMAS JR. in the parking lot of 4829 Flossmoor Place, and that he/she had observed THOMAS JR. go to the third floor of that complex, but could not see which apartment THOMAS JR. went inside.   However, CS-2 stated that when THOMAS JR. returned from that apartment to meet with CS-2, THOMAS JR. had with him a large quantity of crack cocaine and U.S. currency.   CS-2 said THOMAS JR. stores large sums of currency at his girlfriend's residence because of the fact that **TARGET LOCATION 1** has been searched more than once (as discussed above).

23.     Following this intelligence, CCSO officers conducted routine checks of the parking lot of 4829 Flossmoor Place, Waldorf, Maryland, on almost a nightly basis for a period of weeks.   During these parking lot checks, officers regularly observed a 2016 Dodge Ram truck, Blue in color, bearing Maryland license plate 57643CF ("THOMAS JR.'s TRUCK"), parked in that lot.   And I know, through officer's analysis of databases, that this vehicle is registered to THOMAS JR., with an address of **TARGET LOCATION 1**.

24.     In or about December 2016, investigators conducted an analysis of call detail records of four phone numbers known to have been used by THOMAS JR.: (240) 681-8833, (570)

12

453-7678, (570) 880-1476, and (609) 751-7855.   Officers know these numbers were utilized by THOMAS JR. because CS-1 and CS-2 made calls to THOMAS JR. using these numbers in connection with one or more of the aforementioned controlled purchases. This analysis showed that THOMAS JR.'s aforementioned numbers had a very high call frequency to the number (240) 431-9170 (the "-9170 Number").   Indeed, THOMAS JR.'s numbers exchanged over 1,700 calls/SMS with the -9170 Number during the three-month period the records covered.

25.     In turn, officers referenced law enforcement databases and discovered that Shawanna Leigh GLASS, a black female with the date of birth of February 18, 1997, had used and/or provided the -9170 Number to various law enforcement and public data bases.

26.     Further, and on separate occasions during this investigation, CS-1 and CS-2 were each shown a Maryland Driver's license photograph of GLASS (photograph had no names or identifying characteristics). CS-1 and CS-2 both independently identified GLASS as the person they know to be THOMAS JR.'s girlfriend (although they did not know her name).

27.     During the month of January 2017, a CCSO Detective contacted the rental office for 4829 Flossmoor Place, Waldorf, Maryland. The CCSO Detective inquired whether GLASS was a current tenant at the property. Representatives for the business informed the CCSO Detective that GLASS was the sole lease holder of apartment #304 – i.e., **TARGET LOCATION 2**.

28.     In January 2017, THOMAS JR. turned himself in at the Charles County Detention Center to serve a 45-day sentence for possession of marijuana, stemming from the December 2015 search warrant at **TARGET LOCATION 1.**

29.     While THOMAS JR. has been incarcerated, law enforcement has monitored his jail calls.   During these recorded conversations, THOMAS JR. routinely speaks in thinly-veiled

13

code about drug dealing with various persons, including directing GRAY-THOMAS and others to continue operating THOMAS JR.'s drug trafficking operation.    Among other things, THOMAS JR. inquires about the operation's cash flow and/or the cash on hand.   During some of these calls, THOMAS JR. describes specific trees and/or hills nearby **TARGET LOCATION 1**, in describing to others where objects/narcotics are stashed.

30.    During one of the jail calls, THOMAS JR. (in coded language), directs GLASS to pick-up currency from 931 Barrington Drive, Waldorf, Maryland.   THOMAS JR. also describes being able to put away "a stack" (i.e., a thousand dollars or more of U.S. Currency) a week once he's released from prison, so that the two of them can go live on the water.

31.    In or about January 2017, after THOMAS JR's incarceration, CCSO Detectives met with CS-1, and CS-1 stated that he/she had observed THOMAS JR. drop off approximately one ounce of crack cocaine at **TARGET LOCATION 3** in the days leading up to his incarceration. CS-1 stated that THOMAS JR. was operating THOMAS JR.'s TRUCK when he/she observed THOMAS JR. deliver the crack cocaine. Additionally, CS-1 advised he/she frequently observed THOMAS JR.'s TRUCK at **TARGET LOCATION 3** during the months of December 2016 and January 2017.

32.    In or about February 2017, CCSO Detectives met with CS-1, and CS-1 said that he/she had observed THOMAS JR's girlfriend (identified through this investigation as GLASS, leaseholder of **TARGET LOCATION 2**) at **TARGET LOCATION 3**.   CS-1 further stated that GLASS came to **TARGET LOCATION 3** to pick up money that was to be given to GRAY-THOMAS, as proceeds from the one-ounce crack cocaine delivered by THOMAS JR. prior to his incarceration.   CS-1 stated that when GLASS came to **TARGET LOCATION 3**, GLASS was operating the THOMAS JR.'s TRUCK.

14

33.     On February 21, 2017, CCSO Detectives conducted surveillance on GRAY-THOMAS, who was then operating a gold in color 2007 Chevrolet Tahoe bearing Maryland registration A271825, registered to MAMMA GRAY, at **TARGET LOCATION 1.**

34.     During this time, CS-1 contacted a CCSO officer, and stated that GRAY-THOMAS was at **TARGET LOCATION 3**, picking up drug-money, and that GRAY-THOMAS would be dropping off approximately an ounce of crack cocaine at some point in the future.

35.     In turn, an officer traveled to **TARGET LOCATION 3**, and there observed GRAY-THOMAS exit the residence and get into the 2007 Chevrolet Tahoe.

36.     Officers continued to surveil GRAY-THOMAS and the 2007 Chevrolet Tahoe, and in doing so observed GRAY-THOMAS traveling to various locations and meeting with several individuals.  These meetings lasted only a few minutes before GRAY-THOMAS would travel to the next location.  Your affiant and other officers believe, based on corroborated information provided by CS-1 (and other facts, discussed above), that during this surveillance on February 21, 2017, GRAY-THOMAS was picking up money and dropping off drugs, thus continuing the drug operation while THOMAS JR. is incarcerated.

37.     THOMAS JR. is scheduled for release from the Charles County Detention Center at 0000 hours on Friday March 3, 2017.  Officers believe, based on training, experience, and knowledge of this investigation (as discussed above), that upon his release THOMAS JR. will resume active drug-trafficking, and that he and his associates will continue to use the **TARGET LOCATIONS** in furtherance of those crimes.

15

**D. No-Knock Request for TARGET LOCATION 1**

38.     I know, through communication with law enforcement agents who have been inside **TARGET LOCATION 1** and surveilled it extensively, that **TARGET LOCATION 1** has a steel fortified security door, and is equipped with digital surveillance cameras covering the perimeter of the residence. During the execution of prior state search warrants at this location (as discussed above), members of the CCSO Emergency Services Team could not defeat this barrier using standard door-opening devices (short of a battering ram).   Thus, while law enforcement was attempting entry, THOMAS JR. was inside the residence for a period of time, prior to obeying law enforcement commands to unlock the security door.   During this time, THOMAS JR. had had the opportunity to destroy drug evidence, which explains the recovery of empty bulk packaging (which were consistent with kilogram size cocaine wrappings) for cocaine, but no cocaine or crack cocaine.   THOMAS JR. has the live feed for the security cameras in his bedroom where it can be monitored if he is awakened.

39.     I also know, through law enforcement officers' analysis of THOMAS JR.'s criminal history, that THOMAS JR. also has extensive criminal history, to include being the suspect in an ASSAULT W/INTENT to MURDER in 2002, ASSAULT w/GUN in 1998, ASSAULT w/GUN in 1996 and suspect in a MURDER in 1995. THOMAS JR also has a history of fleeing and eluding and resisting arrest when he detects a law enforcement presence.

40.     For these reasons, in order to protect law enforcement and prevent the destruction of evidence, I respectfully request a no-knock warrant with leave to execute at any time, day or night.

**17-0687TJS   17-0688TJS   17-0689TJS**

### Conclusion

41.      Based upon the information set forth above, I respectfully submit that there is probable cause to believe that THOMAS JR., GRAY-THOMAS, GLASS, and others are engaging in a conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, and that those individuals are using the **TARGET LOCATIONS** in furtherance of their drug trafficking activity.    Accordingly, I respectfully request that the Court issue a warrant authorizing the search of the **TARGET LOCATIONS**, and the seizure of evidence, fruits, and instrumentalities of such crimes, as outlined in Attachment B.

Respectfully submitted,

Greg B. O'Haver
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn and subscribed to me this ___2nd___ day of March 2017.

HON. TIMOTHY J. SULLIVAN
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A-1
### (Target Location 1)

**16460 Overhill Way, Hughesville, Maryland and the nearby wooded area.** The residence is described as a gray single-story, single-family dwelling with a white door and steel fortified storm door. There are no numbers on the residence. The driveway is marked with the numbers 16460 on the mailbox. It is surrounded by a **Wooded Area**. Below are images of the residence and the wooded area to be searched.



*Figure 1: 16406 Overhill Way Residence*



*Figure 2: Map Showing Wooded Area in Yellow*

18

17-0687 TJS          17-0688 TJS          17-0689 TJS

## ATTACHMENT A-2
### (Target Location 2)

**4829 FLOSSMOOR PL. APT #304, Waldorf, Maryland.** The residence is described as a beige and brick three story, apartment building with red metal doors. Apartment #304 is the right front apartment on the third floor. The numbers "304" are to the right of the door.  Below are images of the overall complex and the door of the apartment to be searched.



*Figure 3: 4829 Flossmoor Place Apartments*



*Figure 4: Target Location 2 - Door*

**17-0687TJS      17-0688TJS**

**17-0689TJS**

## ATTACHMENT A-3
### (Target Location 3)

**931 Barrington Drive, Waldorf, Maryland.** The residence is described as a brick two story single family dwelling, with a white door and green shutters. An image is below.



**17-0687TJS**       **17-0688TJS**          **17-0689TJS**

## ATTACHMENT B
### (Things to Be Seized)

A. Cocaine, cocaine base (also known as crack cocaine), marijuana, MDMA and any other illegal controlled substances, as well as any materials or items used for the preparation of illegal controlled substances;

B. Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, relating to the transportation, ordering, purchasing and distribution of controlled substances;

C. Address and/or telephone books, papers, paging devices and their contents, and cellular telephones and their contents reflecting names, addresses and/or telephone numbers, including computerized or electronic address and/or telephone records;

D. Books, records, receipts, bank statements and record money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, safety deposit keys, and any other items evidencing the obtaining, secreting, transfer, and/or concealment of assets in the obtaining, secreting, transfer, concealment and/or expending or money;

E. United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds;

F. Photographs, in particular, photographs of co-conspirators, of assets, and/or of controlled substances, and other documents identifying associates and co-conspirators;

G. Indicia of occupancy, residence and/or ownership of the target locations, including but not limited to, utility and telephone bills, canceled envelopes and keys;

H. Indicia of travel, including but not limited to, passport, visas, airline tickets, boarding passes, and airline receipts;

I. Safes: combinations or lock-type, and their contents;

J. Weapons, handguns, and ammunition, as well as items pertaining to the possession of firearms, including gun cases, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs of firearms or of persons in possession of firearms, and receipts for the purchase and/or repair of all these items.